## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| JANET L. FRANK, 114 W. Strub Road, Sandusky, OH 44870-8200, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> XM SATELLITE RADIO HOLDINGS INC., 1500 Eckington Pl., N.E., Washington, D.C. 20002, and HUGH PANERO, 1500 Eckington Pl., N.E., Washington, D.C. 20002 <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CIVIL ACTION NO.**

CLASS ACTION COMPLAINT

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff, Janet L. Frank, ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XM Satellite Radio Holdings Inc. ("XM" or the "Company") securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.    This is a federal class action on behalf of purchasers of the publicly traded securities of XM between July 28, 2005 and February 15, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    XM is the parent company of XM Satellite Radio Inc. ("XM Satellite Radio"), an emerging force in broadcasting.  XM satellite radio delivers its coast-to-coast, digital-quality service with more than 170 digital channels of music, news, talk, radio, sports, comedy and children's programming.  The service is targeted to the nation's 200 million plus automobile and truck drivers as well as home radio users.

3.    The complaint alleges that defendants' Class Period representations regarding XM's financial statements, business, and prospects were materially false and misleading when made.  Specifically, the defendants failed to disclose:  (1) that the Company was unable to attain its stated subscriber goal of 6 million subscribers without increasing costs to acquire new subscribers;  (2) that, in order to achieve its subscriber goal, XM required a substantial advertising campaign in the fourth quarter of 2005  which increased the Company's costs to acquire new subscribers;  (3) that, as a result of the foregoing, the Company's net losses substantially increased; and (4) that defendants' statements concerning the Company's continued ability to lower its costs to acquire new subscribers were lacking in any reasonable basis when made.

4.    On February 16, 2006, before the market opened, XM announced financial results for the fourth quarter and full year ended December 31, 2005.  XM reported sharply higher subscriber acquisition costs ("SAC") and costs per gross addition ("CPGA") than previously projected for both the fourth quarter and the year ended December 31, 2005.

5.    On this news, shares of XM's stock fell $1.27, or 5 percent, to close, on February 16, 2006, at $23.98 per share.

6.      Shares of XM stock continued to fall the next day, as analysts downgraded the stock. As a result of this, XM's stock shed an additional $2.41, or 10 percent, to close, on February 17, 2006, at $21.57 per share.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office within this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiff, Janet L. Frank, as set forth in the accompanying certification, incorporated by reference herein, purchased XM securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.    Defendant XM is a Delaware corporation with its principal place of business located at 1500 Eckington Place, N.E., Washington, D.C., 20002.

13.    Defendant Hugh Panero ("Panero") was, at all relevant times, the Company's President and Chief Executive Officer.

14.    Defendant Panero is referred to hereinafter as the "Individual Defendant." The Individual Defendant, because of his positions with the Company, possessed the power and authority to control the contents of XM's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Defendant Panero was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non public information available to him, this defendant knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendant is liable for the false statements pleaded herein, as those statements were each "group- published" information, the result of the collective actions of the defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

15.    XM is the parent company of XM Satellite Radio, an emerging force in broadcasting. XM satellite radio delivers its coast-to-coast, digital-quality service with more than 170 digital channels of music, news, talk, radio, sports, comedy and children's programming. The service is targeted to the nation's 200 million plus automobile and truck drivers as well as home radio users.

**Materially False and Misleading**
**Statements Issued During the Class Period**

16.    The Class Period commences on July 28, 2005.  At that time, XM issued a press

release entitled "XM Satellite Radio Holdings Inc. Announces Second Quarter 2005 Results and

Increases Year-End Subscriber Guidance to 6 Million."  Therein, the Company, in relevant part,

stated:

> XM SATELLITE RADIO HOLDINGS INC. ANNOUNCES
> SECOND QUARTER 2005 RESULTS AND INCREASES
> YEAR-END SUBSCRIBER GUIDANCE TO 6 MILLION
>
> $125 Million in Revenues More than Double Prior Year Period
> Ends Quarter at 4.4 Million Subs with 647,226 Net Subscriber
> Additions
>
> Washington D.C., July 28, 2005 -- XM Satellite Radio Holdings
> Inc. (NASDAQ: XMSR) today reported financial and operating
> results for the second quarter ended June 30, 2005. For the quarter,
> XM reported revenue of $125 million, an increase of 136 percent
> over the $53 million reported in the second quarter 2004. The
> significant revenue growth was driven by record second quarter net
> subscriber additions of 647,226, a 55 percent increase over the
> 418,449 subscribers added in the second quarter 2004. XM ended
> the quarter with 4,417,490 subscribers compared with 2,100,352
> subscribers reported for the second quarter 2004.
>
> With XM's first half performance and an even stronger outlook for
> the second half of the year, XM is increasing 2005 subscriber
> guidance from 5.5 million to 6 million ending subscribers.
>
> XM's net loss for the second quarter 2005 was ($146.6) million, as
> compared to ($166.1) million in the second quarter 2004. XM
> reported an EBITDA loss of ($89.9) million for the second quarter
> 2005 compared to ($107.8) million for the second quarter 2004.
> XM's net loss and EBITDA for the second quarter 2004 each
> included a ($35.0) million charge for de-leveraging activities.
>
> Efficient Quarterly Subscriber Growth
>
> XM's second quarter subscriber growth was strong across both the
> retail aftermarket and automotive distribution channels. Second
> quarter 2005 Cost Per Gross Addition (CPGA) was $98, an
> improvement of $3, or 3 percent, from the $101 CPGA reported in

the second quarter 2004. XM's CPGA is the fully-loaded cost to acquire each new subscriber, including Subscriber Acquisition Costs (SAC) of $50, as well as advertising and marketing expenses.

17.    On August 5, 2005, XM filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Panero and reaffirmed the Company's previously announced financial results.

18.    Additionally, and with respect to the costs of acquiring new subscribers, the Company stated:

> [XM is] continuing to grow our gross margin (calculated as revenues less variable costs, which include revenue share & royalties, customer care & billing operations, cost of merchandise & ad sales) during the three months and six months ended June 30, 2005 while reducing our costs to acquire each new subscriber
>
>            ***
>
> We will continue to incur operating losses until we substantially increase the number of our subscribers. We are focused on increasing subscribers and scaling our business while managing growth and containing costs.
>
>            ***
>
> We will continue to incur operating losses until we substantially increase the number of our subscribers. We are focused on increasing subscribers and scaling our business while managing growth and containing costs.
>
>            ***
>
> The costs to acquire subscribers vary by distribution channel, and a change in the mix of subscribers from higher cost distribution channels to lower cost distribution channels will have a favorable impact on cost per gross addition ("CPGA"). We expect CPGA to decline in 2005 as compared to 2004.

19.    On September 27, 2005, XM issued a press release entitled "XM Satellite Radio Tops Five Million Subscribers." Therein, defendant Panero stated:

With more than five million subscribers today, XM continues to expand its position as the leader in the satellite radio industry. We are on track to have more than six million subscribers by the end of the year. Consumers are choosing XM because we offer the most choices, including the most commercial-free music and live sporting events, and the most advanced technology. With the winning combination of outstanding new channels and breakthrough products in advance of the holiday season, XM is poised for record growth during the fourth quarter.

20.   On October 27, 2005, XM issued a press release entitled "XM Satellite Radio Holdings Inc. Announces Third Quarter 2005 Results and Reaffirms 6 Million Subscriber Guidance." Therein, the Company, in relevant part, stated:

XM SATELLITE RADIO HOLDINGS INC. ANNOUNCES THIRD QUARTER 2005 RESULTS AND REAFFIRMS 6 MILLION SUBSCRIBER GUIDANCE

Revenues up 134% to $153 million in third quarter, compared to prior year period;

Subscribers double to 5,034,642 from prior year; Expands lead with 617,152 net additions

GM and Honda to produce more than 2 million 2006 XM-equipped vehicles

Washington D.C., October 27, 2005 -- XM Satellite Radio Holdings Inc. (NASDAQ: XMSR) today reported financial and operating results for the third quarter ended September 30, 2005. XM ended the quarter with 5,034,642 subscribers, doubling the 2,516,023 subscribers reported last year for the third quarter. The growth was driven by third quarter net subscriber additions of 617,152, a 48 percent increase over the 415,671 net subscribers added in the third quarter 2004. Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005.

XM's net loss for the third quarter 2005 was ($131.9) million, as compared to ($118.0) million in the third quarter 2004. XM reported an EBITDA loss of ($73.8) million for the third quarter 2005 compared to a third quarter 2004 loss of ($62.9) million.

Record Revenue from Cost-Effective Subscriber Growth

For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004. XM's third quarter subscriber growth was driven by strong automotive and retail distribution performance with a range of full-featured products. Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 was $89. XM products are well stocked for the holiday season and XM expects to accelerate its subscriber and revenue growth through the fourth quarter.

21.    Also on October 27, 2005, defendants hosted an investor conference call to discuss the Company's third quarter results. During the call, defendant Panero stated that the third quarter of 2005 was a quarter "that exemplified what I've characterized as the smart subscriber growth the Company has demonstrated quarter after quarter and year after year since we started service in November 2001." Additionally, defendant Panero stated:

[T]he secret to XM's smart subscriber growth rather than growth at any costs is the ability to control marketing and product expenses while rapidly growing subscribers. This quarter XM kept its fully loaded per unit costs capturing a new subscriber, or CPGA, constant at $89 – the same CPGA that we reported in the third quarter last year. These results provide us with the flexibility to aggressively advertise and market our service in the fourth quarter. In fact, that is what we are doing implementing a comprehensive media campaign comprised of advertisements, rebates and other promotional techniques to fully exploit the holiday selling season again this year.

22.    On November 1, 2005, XM issued a press release entitled "XM Satellite Radio Gains Retail Market Share in Third Quarter." Therein, the Company stated:

XM SATELLITE RADIO GAINS RETAIL MARKET SHARE IN THIRD QUARTER

Washington D.C., November 01, 2005 -- XM Satellite Radio (NASDAQ: XMSR) today announced that, based on the latest satellite radio industry subscriber results, XM increased its retail market leadership with a 59 percent market share in the 3rd quarter compared to 56 percent in the 2nd quarter. The market share figures are based on XM's addition of 305,284 net retail subscribers in the 3rd quarter versus the 209,920 net retail

subscriber additions announced by its competitor today. XM's total industry share, which includes retail and new car subscribers, was 63 percent for the 3rd quarter with XM adding 617,152 total subscribers and its competitor 359,294.

"XM subscribers represent two out of every three satellite radio customers. Satellite radio is one of the fastest-growing entertainment services ever and is expected to exceed more than nine million total subscribers by the end of this year," said Hugh Panero, XM's President and CEO. "XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor."

On November 7, 2005, XM filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Panero and reaffirmed the Company's previously announced financial results.

23.    Additionally, and with respect to SAC, the Company stated:

[XM is] continuing to grow our subscription margin (calculated as Subscription revenue less variable costs, which include Revenue share & royalties, and Customer care & billing operations) during the three months and nine months ended September 30, 2005 while reducing our Subscription acquisition costs).

\*\*\*

The timing of promotions and new contracts may cause SAC to fluctuate from period to period.

24.    The statements contained in ¶¶ 16-23 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company was unable to attain its stated subscriber goal of 6 million subscribers without increasing costs to acquire new subscribers;  (2) that, in order to achieve its subscriber goal, XM required a substantial advertising campaign in the fourth quarter of 2005  which increased the Company's costs to acquire new subscribers; (3) that, as a result of the foregoing, the Company's net losses substantially increased; and (4) that defendants' statements concerning the Company's continued

ability to lower its costs to acquire new subscribers were lacking in any reasonable basis when made.

### The Truth Begins to Emerge

25.    On February 16, 2006, before the market opened, XM announced financial results for the fourth quarter and full year ended December 31, 2005.  XM reported sharply higher 2005 revenue, and said it expected to report positive cash flow from operations in the fourth quarter of 2006.  For the fourth quarter of 2005, XM reported quarterly total revenue of $177 million, an increase of 113 percent over the $83.1 million total revenue reported in fourth quarter of 2004.  XM's full year 2005 total revenue was $558.3 million, an increase of 128 percent over the $244.4 million total revenue recorded in 2004.  For the fourth quarter, SAC, a component of CPGA was $89 compared to $64 in the same period last year.  CPGA in the fourth quarter was $141 compared to $104 in the same period last year.  For full year 2005, SAC was $64, a slight increase from $62 in 2004, and CPGA was $109, compared to $100 in 2004.  XM's net loss for the fourth quarter of 2005 was ($268.3) million as compared to a net loss of ($188.2) million in the fourth quarter of 2004.  For the full year 2005, XM's net loss was ($666.7) million, compared to a net loss of ($642.4) million in 2004.

26.    Commenting on these results, defendant Panero stated:

> 2005 was a significant growth year for XM in which we added more than 2.7 million net subscribers.  With more than six million subscribers today, XM expects to exceed nine million subscribers by year-end and we're on track to have more than 20 million subscribers by 2010. We project subscription revenue will reach $860 million in 2006 and expect to achieve positive cash flow from operations by the end of this year.

27.    On this news, shares of XM's stock fell $1.27, or 5 percent, to close, on February 16, 2006, at $23.98 per share.

28.    Also on February 16, 2006, XM reported that Director Pierce J. Roberts, Jr. had

submitted a letter of resignation to the SEC on Form 8-K.  The Company stated:

> On Monday, February 13, 2006, XM Satellite Radio Holdings Inc.
> Board Chairman Gary Parsons received a letter of resignation via
> email from XM Director Pierce J. Roberts, Jr. All other Board
> members were copied on the letter of resignation. The Company
> believes, and the resignation letter notes, that Director Roberts
> resigned based on his disagreements with the Company and other
> Board members regarding certain aspects of the Company's
> operational direction. This disclosure is made pursuant to
> Item 5.02(a) of Form 8-K regarding resignation of directors in
> disagreement with the Company.

> Although the letter does not explicitly state the nature of the
> disagreement, the Company believes the disagreement with
> Director Roberts primarily involves the strategic balance of growth
> versus cash flow. Director Roberts has historically favored more
> stringent cost control in the Company, specifically involving lower
> marketing, programming and promotional expenditures. While
> Director Roberts believed that expenses could be lowered without
> jeopardizing subscriber and revenue growth and/or market share,
> he was prepared to risk growth or market share impacts if they
> resulted, with the belief that positive cash generation would occur
> sooner, and the Company's stock would be valued more highly as
> a smaller, but more profitable enterprise.

> The Company and other Directors concur in Mr. Roberts'
> assessment that lower programming and marketing expenditures,
> and a potentially lower growth rate, would likely result in earlier
> positive cash generation. The other Directors, however, believe
> that the Company's high growth rate, market leadership and large
> base of subscribers are strategically important assets to ensure the
> Company's long term value and can be sustained while also
> reaching positive operating cash flow later this year. These
> differing views of strategic direction and balance between growth
> and profitability have been voiced openly for a number of years,
> but Director Roberts states that he can no longer be effective given
> the ongoing disagreement with management and the other Board
> members regarding the relative importance, risks and priorities of
> these two common goals.

29.     Additionally, the Company's Form 8-K contained Pierce Roberts' resignation letter, which stated:

> That said, I have been troubled about the current direction of the company and do not believe that it is in the best interest of the company's shareholders. For some time I have made my analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of the Company. I am not having any useful effect and I care too much and believe in my own views too much to just "go along".
>
> Given current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes now. It is clear to me that I cannot be part of the solution and I will not be part of the problem.

30.     Shares of XM stock continued to fall the next day, as analysts downgraded the stock. As a result of this, XM's stock shed an additional $2.41, or 10 percent, to close, on February 17, 2006, at $21.57 per share.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of XM between July 28, 2005 and February 15, 2006, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, XM's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands

of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by XM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by defendants' acts as alleged herein;

    b.    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of XM; and

    c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

37.    The market for XM's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, XM's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired XM securities relying upon the integrity of the market price of XM's securities and market information relating to XM, and have been damaged thereby.

38.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of XM's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

39.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about XM's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of XM and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially

false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

40.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

41.    During the Class Period, Plaintiff and the Class purchased securities of XM at artificially inflated prices and were damaged thereby.  The price of XM common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

42.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding XM, their control over, and/or receipt and/or modification of XM's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning XM, participated in the fraudulent scheme alleged herein.

43.    During the Class Period, and with the Company's stock trading at artificially inflated prices, defendant Panero sold 413,334 shares for gross proceeds of $11,801,664.90, as evidenced by the following chart:

| NAME | DATE | SHARES SOLD | PRICE | GROSS PROCEEDS |
|------|------|-------------|-------|----------------|
| Hugh Panero | 12/6/2005 | 10,000 | $28.95 | $289,500.00 |
| | 12/6/2005 | 10,000 | $28.94 | $289,400.00 |
| | 12/6/2005 | 10,000 | $28.90 | $289,900.00 |
| | 12/6/2005 | 10,000 | $28.88 | $288,800.00 |
| | 12/6/2005 | 30,000 | $28.80 | $864,000.00 |
| | 12/6/2005 | 10,000 | $28.78 | $287,800.00 |
| | 12/6/2005 | 10,000 | $28.767 | $287,670.00 |
| | 12/6/2005 | 10,000 | $28.64 | $286,400.00 |
| | 12/6/2005 | 10,000 | $28.575 | $285,750.00 |
| | 12/6/2005 | 23,514 | $28.55 | $671,324.70 |
| | 12/6/2005 | 50,000 | $28.53 | $1,426,500.00 |
| | 12/6/2005 | 10,000 | $28.52 | $285,200.00 |
| | 12/6/2005 | 30,000 | $28.5154 | $855,462.00 |
| | 12/6/2005 | 10,000 | $28.49 | $284,900.00 |
| | 12/6/2005 | 10,000 | $28.47 | $284,700.00 |
| | 12/6/2005 | 10,000 | $28.46 | $284,600.00 |
| | 12/6/2005 | 20,000 | $28.4561 | $569,122.00 |
| | 12/6/2005 | 74,820 | $28.41 | $2,125,636.20 |
| | 12/6/2005 | 25,000 | $28.40 | $710,000.00 |
| | 12/6/2005 | 20,000 | $28.38 | $567,600.00 |
| | 12/6/2005 | 20,000 | $28.37 | $567,400.00 |
| | | **Total: 413,334** | | **Total: $11,801,664.90** |

## Applicability of Presumption of Reliance:
## Fraud On The Market Doctrine

44.    At all relevant times, the market for XM securities was an efficient market for the following reasons, among others:

   a.    XM stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

   b.    As a regulated issuer, XM filed periodic public reports with the SEC and NASDAQ;

      c.      XM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.      XM was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

45.    As a result of the foregoing, the market for XM securities promptly digested current information regarding XM from all publicly-available sources and reflected such information in XM stock price. Under these circumstances, all purchasers of XM's securities during the Class Period suffered similar injury through their purchase of XM securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

46.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of XM who knew that those statements were false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase XM securities at artificially inflated prices.    In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

49.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for XM securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.    All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of XM as specified herein.

51.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of XM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about XM and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of XM securities during the Class Period.

52.    The Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendant was a high-level executive and/or director at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) this defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) this defendant enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) this defendant was aware of the Company's dissemination of

information to the investing public which they knew or recklessly disregarded was materially false and misleading.

53.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing XM's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of XM securities was artificially inflated during the Class Period.    In ignorance of the fact that market prices of XM's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired XM securities during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that XM was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their XM securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendant**

58.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.    The Individual Defendant acted as a controlling person of XM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

Plaintiff contend are false and misleading. The Individual Defendant was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.    In particular, this defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61.    As set forth above, XM and the Individual Defendant each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendant is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

   a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

   b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 8, 2006              Respectfully submitted,

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C**

By: _____

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
Joseph Helm
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600
Fax: (202) 408-4699

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Richard A. Lockridge
Karen H. Riebel
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
Fax: (612) 339-0981

**CAPRETZ & ASSOCIATES**
James T. Capretz (CA SB No. 44442)
Larry A. Sebastian
5000 Birch Street, Suite 2500
Newport Beach, CA 92660
(949) 724-3000
Fax: (949) 757-2635

**ZIMMERMAN REED, P.L.L.P**
Carolyn G. Anderson
Robert C. Moilanen
651 Nicollet Mall
Suite 501
Minneapolis, MN  55401
(612) 341-0400
Fax:  (612) 341-0844

**Attorneys for Plaintiff**

## PLAINTIFF CERTIFICATION

I, Janet Frank, hereby state:

1.    I have reviewed a Complaint against XM Satellite Radio Holdings, Inc., and Hugh Panero, and have authorized the filing of the same or a similar complaint on my behalf.

2.    I did not purchase any XM Satellite Radio Holdings, Inc. securities at the direction of counsel or in order to participate in this private action.

3.    I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of my transactions in XM Satellite Radio Holdings, Inc. securities during the Class Period (July 28, 2005 through February 15, 2006) as defined in the Complaint:

| TRANSACTION | TRADE DATE | PRICE | QUANTITY |
|---|---|---|---|
| PURCHASE | 2/9/2006 | 25.87 | 150 |

5.    I have filed the following civil actions as a representative party on behalf of a class under the federal securities laws during the last three years:

6.    I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of June, 2006.

_Janet L. Frank_
Janet L. Frank

Erie County, OH
(county of residence)

357301  1